IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiffs, | ) | 4:07CR3034 |
| | ) | |
| v. | ) | |
| | ) | |
| JOSE ANAYA-ZEPEDA, MIGUEL | ) | REPORT, RECOMMENDATION, |
| ANGEL AYALA ARIAS, | ) | AND ORDER |
| | ) | |
| Defendants. | ) | |
| | ) | |

        The defendants have filed a motion to suppress all evidence
obtained as a result of the traffic stop and search of a vehicle
driven by defendant Anaya-Zepeda on January 6, 2007.  Filings 23
& 25.  Defendant Ayala-Arias was a passenger in the vehicle at
the time of the stop.  The defendants claim their Fourth
Amendment rights were violated because the traffic stop was
illegal, the trooper expanded the stop without reasonable
justification, and their vehicle was searched without a warrant
in the absence of either probable cause or their knowing and
voluntary consent.  Defendant Anaya-Zepeda further claims his
Fifth Amendment rights were violated when he was subjected to
custodial questioning following his arrest.

        For the reasons discussed below, I conclude the defendants'
motions to suppress should be denied.

FACTUAL FINDINGS

On January 6, 2007 at approximately 3:00 p.m.,[1] the
defendants were traveling eastbound on Interstate 80 near the
county line between Hall and Hamilton Counties in Nebraska.
Anaya-Zepeda was driving a green 1996 Toyota Camry, and defendant
Ayala-Arias was a front seat passenger.

Trooper Jeff Roby, a Nebraska State Patrol officer with
eleven years of law enforcement experience, was patrolling the
eastbound interstate when he noticed the defendants' vehicle
weaving within its lane.  Trooper Roby drove his patrol car into
the passing lane, positioned his vehicle approximately 200 feet
behind the defendants' vehicle, manually activated his in-car
camera, and from his position in the passing lane, monitored the
defendants' movements for approximately two miles.  He noted that
the speed of defendants' vehicle was vacillating between 60 and
75 miles per hour.  The trooper also noticed that defendants'
vehicle sped up when it was being passed by another vehicle, and
after the passing vehicle returned to the right hand lane, the
defendants' vehicle followed it approximately .68 seconds behind.

Trooper Roby's .68 second time estimate was based on three
separate VASCAR[2] measurements.  A VASCAR can be used to calculate
both speed and time.  In this case, Trooper Roby, who had passed

---

[1]The time entry on the digital video disc ("dvd") recording
of this traffic stop, exhibit 1, indicates the stop occurred at
approximately 12:46 p.m.  See exhibit 1.  The time entries
throughout this recording are off by approximately two hours.  In
all other respects, the dvd recording accurately records the
events that occurred during the stop.

[2]VASCAR is an acronym for "Visual Average Speed Computer And
Recorder."

2

all proficiency testing on the use of the VASCAR, used the system
to determine the time interval between the defendants' vehicle
and the vehicle it was following. Based on Trooper Roby's
description, when used to measure time rather than speed, the
VASCAR operates much like a stopwatch. Trooper Roby activated
the instrument when the rear of the first vehicle passed over a
fixed point on the highway, stopped it when the front of
defendants' vehicle crossed that point, and observed the
instrument's time reading. In accordance with his training, the
officer conducted this procedure three times to verify both the
accuracy and the precision of his measurements. The three
measurements were all approximately .68 seconds.

Based on his training and experience as a road patrol
officer, Trooper Roby credibly testified that when vehicles are
traveling at approximately 70 miles per hour, .68 seconds is not
enough time for a driver to perceive a danger, react, and stop to
avoid colliding with the vehicle ahead. He explained that two
seconds may be enough when the vehicles are traveling at 60 miles
per hour, and a time interval approaching three seconds is needed
when vehicle speeds approach 75 miles per hour. Trooper Roby
initiated a traffic stop of defendants' vehicle for following too
closely.

The defendants immediately pulled over on the shoulder near
mile marker 319 of Interstate 80. Trooper Roby exited his
vehicle and went to the passenger side window of the
stopped vehicle to speak with the defendants. In response to his
request, Anaya-Zepeda produced his drivers license and insurance
paperwork for the vehicle. See exhibits 3 & 7. During the
course of the traffic stop, Trooper Roby discovered that the
vehicle had been purchased less than a month earlier, and was

3

insured for only one month.  See exhibit 7.  When Trooper Roby
asked Anaya-Zepeda if he was getting sleepy, Anaya-Zepeda
acknowledged that he was and stated he had been driving for quite
awhile.  Trooper Roby advised the defendants that the vehicle was
weaving within its lane, with speeds varying between 60 and 75
miles per hour, and that Anaya-Zepeda had sped up while being
passed and was following the passing vehicle too closely.
Trooper Roby stated he would issue Anaya-Zepeda a warning ticket.
Anaya-Zepeda was asked to step out of the vehicle and be seated
in the patrol car.  Ayala-Arias remained seated in the front
passenger seat of the stopped vehicle.

    Anaya-Zepeda sat in the passenger front seat of the patrol
vehicle while Trooper Roby began writing a warning ticket.
Trooper Roby again explained his observations and why he
initiated the traffic stop.  Anaya-Zepeda acknowledged that he
was tired and stated he planned to stop in Lincoln, Nebraska to
rest.  During the course of the dialogue, Anaya-Zepeda further
explained that Ayala-Arias was napping in the vehicle when the
traffic stop was initiated so that he could take over the
driving.

    Trooper Roby asked for the passenger's name.  Anaya-Zepeda
initially responded, "I'm not sure," but upon further
questioning, stated, "Miguel."  Anaya-Zepeda did not know the
passenger's last name.  Trooper Roby contacted dispatch to check
Anaya-Zepeda's driver's license and criminal history.  The
drivers license provided by Anaya-Zepeda listed his name as Jose
Anaya-Zepeda, with a Michigan address.  See exhibit 3.

    Trooper Roby asked Anaya-Zepeda questions concerning the
origin, purpose, and destination of defendants' trip.  Anaya-

4

Zepeda stated he and Ayala-Arias were traveling from Las Vegas to
Michigan.  He explained he had moved to Las Vegas from Michigan,
and had lived in Las Vegas for eight months, but he never changed
the address on his driver's license.  He stated he had worked at
the Venetian in Las Vegas, but had given that employer two weeks
notice and was traveling back to Michigan to see if he could get
his prior job back.

Trooper Roby continued filling out the warning ticket as he
awaited driver's license and criminal history information from
dispatch.  While he did so, Trooper Roby asked Anaya-Zepeda where
the defendants were staying in Michigan.  Anaya-Zepeda said they
were staying with family.  In response to questioning about the
trip itself, Anaya-Zepeda explained that he and Ayala-Arias had
left Las Vegas the day before and had driven straight through
(approximately 1000 miles) without stopping to sleep.

Dispatch advised that Anaya-Zepeda had no driving record in
Nevada, a valid Michigan driver's license, and no criminal
history.

Trooper Roby exited the vehicle to speak with the passenger.
He asked Ayala-Arias for identification, and was handed a Mexican
identification card.  In response to questioning by Trooper Roby,
Ayala-Arias stated the defendants were en route to Michigan; he
was going for a short vacation, and Anaya-Zepeda was going to see
friends.  When Trooper Roby asked Ayala-Arias for the driver's
name, Ayala-Arias responded, "Pepe," and stated he did not know
the driver's last name.  When asked how long he had known the
driver, Ayala-Arias stated he and Anaya-Zepeda were from the same
small town in Mexico and had known each other for twenty years.

5

Ayala-Arias stated he lived in Las Vegas and had lived in the
United States for two to three months.

Trooper Roby returned to the patrol vehicle to complete the
warning ticket.  He contacted dispatch with the information from
Ayala-Arias's identification card.  Since "Pepe" was not the name
on Anaya-Zepeda's driver's license, Trooper Roby asked Anaya-
Zepeda if he went by any other names.  See exhibit 1 at 12:45:45.
Anaya-Zepeda responded that he did not.  When Trooper Roby asked
Anaya-Zepeda how long he had been in the United States, Anaya-
Zepeda stated he had been here ten years and Ayala-Arias had been
in the United States for five years.  Anaya-Zepeda stated he and
Ayala-Arias had resided together in Las Vegas for the last two or
three months.

Dispatch reported that Ayala-Arias had no driver's license
in Nevada.  His only criminal history was a border violation.

Trooper Roby again expressed concern with Anaya-Zepeda
driving while tired, and though he initially stated that perhaps
Ayala-Arias should drive since he had napped, the officer
corrected himself and told Anaya-Zepeda that Ayala-Arias could
not drive since he was not a licensed driver in the United
States.  Trooper Roby therefore advised Anaya-Zepeda that
although he now appeared awake enough to safely drive, he should
stop if he got tired.  Anaya-Zepeda responded that he would
probably stop in Lincoln, Nebraska.

Trooper Roby completed the warning ticket, (see exhibit 4),
and explained it to Anaya-Zepeda.  Fourteen minutes after the
vehicle was stopped, Trooper Roby handed the ticket and the
defendants' paperwork to Anaya-Zepeda, and advised Anaya-Zepeda

that the traffic stop was complete and he was free to leave.
Exhibit 1 at 12:59.  As Anaya-Zepeda began to exit the vehicle,
Trooper Roby asked him if he would mind answering a few
questions.  Anaya-Zepeda stopped exiting the vehicle.  Trooper
Roby asked a series of questions concerning the presence of guns,
knives, marijuana, methamphetamine, heroine, or cocaine in the
vehicle.  Anaya-Zepeda denied possessing any of these items.
Trooper Roby asked if he could search the vehicle.  Without
hesitation, Anaya-Zepeda responded, "Sure, go ahead."   Filing
37 (transcript), p. 35; exhibit 1 at 13:00.  Trooper Roby asked
Anaya-Zepeda to stay in the patrol vehicle and exited the vehicle
to speak with Ayala-Arias.

        Trooper Roby advised Ayala-Arias that the traffic stop was
over.  He then asked Ayala-Arias the same series of questions
posed to Anaya-Zepeda.  Ayala-Arias also denied having guns,
knives, marijuana, methamphetamine, heroine, or cocaine in the
vehicle.  Trooper Roby asked if he could search the vehicle, and
Ayala-Arias said he could.  Trooper Roby asked Ayala-Arias to sit
in the rear passenger seat of the trooper's vehicle.  Ayala-Arias
immediately complied with this request.

        All communications with both defendants during the traffic
stop were in English, and both defendants responded appropriately
to questions and appeared to understand the language.  Neither
indicated any difficulty understanding the officer's questions or
comments.  Both defendants appeared coherent; neither appeared
under the influence of any drug or alcohol.  Though Anaya-Zepeda
was sleepy at the outset of the traffic stop, he appeared alert
when answering the officer's questions in the vehicle.

Trooper Roby and Trooper Greg Goltz, who had arrived a few minutes earlier, began to search the vehicle. Shortly after the search began, the officers located an after-market vehicle modification that appeared to create an elaborately constructed, hidden false compartment within the vehicle. They continued to diligently search the vehicle until, nearly thirty minutes later, they finally accessed the hidden compartment and discovered illegal drugs. Exhibit 1 at 13:35.

During the search, the defendants remained in the patrol vehicle. When Trooper Roby advised the defendants that he believed the vehicle had a false compartment and they were being detained, neither withdrew their consent to search the vehicle. Exhibit 1 at 13:32. Though the patrol car doors were unlocked at all times, the defendants did not exit the vehicle and gesture or state that the officers should stop their search.

After the drugs were found, the defendants were arrested, handcuffed, and transported to the NSP's Troop C headquarters in Grand Island to be interviewed. Lieutenant Dennis Leonard, the NSP Troop C Investigative Service Commander, was at the NSP office catching up on paperwork. It was a Saturday, and although Investigator Scott Javins was on call that weekend, he was approximately twenty to thirty minutes away when the defendants arrived in Grand Island. Therefore, Lieutenant Leonard assigned himself to begin the interview process with Anaya-Zepeda.

Lieutenant Leonard's interview of Anaya-Zepeda began at approximately 4:45 p.m. in the interview room at NSP's Troop C headquarters. See exhibit 9 (dvd of interviews). Lieutenant Leonard began by removing Anaya-Zepeda's handcuffs, introducing himself, and obtaining background biographical information from

Anaya-Zepeda.  Anaya-Zepeda appeared alert, relaxed, and
unimpaired.  He stated he had a high school education from
Mexico, could speak and understand English, and had been able to
speak English for at least six years.  All interviews with the
defendant that day were conducted in English without difficulty.

Lieutenant Leonard advised Anaya-Zepeda that he wanted to
ask him questions about the drugs found in the vehicle.  Before
advising Anaya-Zepeda of his <u>Miranda</u> rights, Lieutenant Leonard
explained that Anaya-Zepeda did not have to agree to answer any
questions, or he could agree to answer some questions and refuse
to answer others, but any answers he chose to provide must be
truthful.

Lieutenant Leonard then advised Anaya-Zepeda of his <u>Miranda</u>
rights by reading the NSP Advice of Rights form aloud.  As each
right was read separately, Anaya-Zepeda acknowledged that he
understood the right.  Lieutenant Leonard then placed a checkmark
behind that right on the Advice of Rights form.  After the
<u>Miranda</u> rights were read, Lieutenant Leonard explained the
gravity of the charges Anaya-Zepeda faced, including the fact
that he likely faced federal prosecution.  He explained the
federal sentencing guidelines, that a judge can depart upward or
downward from those guidelines, and that a judge may grant a
downward departure if a defendant cooperates with law
enforcement.  Lieutenant Leonard made no promises of leniency or
threats to secure Anaya-Zepeda's consent to questioning.  Exhibit
9 at 13:30 to 17:40.

Lieutenant Leonard then read the waiver portion of the NSP
Advice of Rights form, reminded Anaya-Zepeda that he was not
required to sign it, and asked Anaya-Zepeda if he would sign the

9

waiver.  Anaya-Zepeda immediately signed the waiver of rights.
See exhibit 5 (Advice of Rights form); exhibit 9 at 17:40 to
18:40.  Lieutenant Leonard proceeded to interview Anaya-Zepeda
for about twenty minutes until Investigator Javins arrived.

When Investigator Javins arrived, he briefly questioned
Anaya-Zepeda.  The questioning was stopped when it was clear to
the officer that Anaya-Zepeda was being evasive or untruthful,
and that he was unwilling to assist in a controlled delivery.
Anaya-Zepeda was then escorted to the basement of the Troop C
headquarters to be supervised by Investigator Rick Conrad while
Investigator Javins spoke to Ayala-Arias.[3]

Investigator Conrad supervised Anaya-Zepeda for about thirty
minutes.[4]  During this time, Anaya-Zepeda calmly and readily
conversed with Investigator Conrad about the traffic stop, his
employment, and his background.

When Investigator Javins returned for Anaya-Zepeda,
Investigator Conrad related that Anaya-Zepeda had made several
statements.  Investigator Javins again asked Anaya-Zepeda if he
was willing to cooperate in a controlled delivery.  Anaya-Zepeda
was not willing to do so, and no further interviews were done.

During the entirety of the questioning by Lieutenant
Leonard, and Investigators Javins and Conrad, Anaya-Zepeda never

---

[3]Ayala-Arias did not waive his Miranda rights, and he was
not interrogated.  Ayala-Arias has not raised a Fifth Amendment
claim.

[4]This basement room is not equipped with a video camera.
Therefore, Investigator Conrad's dialogue with and questioning of
Anaya-Zepeda is not included in exhibit 9.

requested an attorney and never asked that the questioning be
stopped.  No apparent language barrier existed.  Anaya-Zepeda
appeared alert, and did not appear under the influence of any
drugs or alcohol.  The officers' questioning was direct and
candid, and they made no promises or threats to obtain Anaya-
Zepeda's consent to interrogation or responses to their
questions.


LEGAL ANALYSIS


1.   Fourth Amendment Claims.


The defendants claim Trooper Roby violated the Fourth
Amendment by conducting an unlawful traffic stop.  A traffic stop
is lawful "where the police have probable cause to believe that a
traffic violation has occurred."  Whren v. United States, 517
U.S. 806, 810 (1996).  "[I]t is well established that a traffic
violation--however minor--creates probable cause to stop the
driver of a vehicle."  United States v. Lyons, 486 F.3d 367, 371
(8th Cir. 2007).  See also United States v. Fuse, 391 F.3d 924,
927 (8th Cir. 2004); United States v. Herrera-Martinez, 354 F.3d
932, 934 (8th Cir. 2004); United States v. Linkous, 285 F.3d 716,
719 (8th Cir. 2002); United States v. Alcantar, 271 F.3d 731, 736
(8th Cir. 2001).  "Courts are not to consider the motive for a
stop as long as the reason for the stop is valid."  United States
v. Jones, 275 F.3d 673, 680 (8th Cir. 2001).  Although a traffic
stop cannot be pretextual, "so long as the officer is doing
nothing more than he is legally permitted and objectively
authorized to do, his actual state of mind is irrelevant for
purposes of determining the lawfulness of the stop."  Alcantar,


11

271 F.3d at 736.  See also <u>Whren</u>, 517 U.S. at 812; <u>United States v. Bell</u>, 86 F.3d 820, 822 (8th Cir. 1996).

Nebraska law provides:

> The driver of a motor vehicle shall not follow another
> vehicle more closely than is reasonable and prudent,
> and such driver shall have due regard for the speed of
> such vehicles and the traffic upon and the condition of
> the roadway.

Neb. Rev. Stat. § 60-6,140 (1).  A trooper's observation of a vehicle following another too closely provides probable cause for a traffic stop.  <u>United States v. Lyton</u>, 161 F.3d 1168, 1170 (8th Cir. 1998)(interpreting Nebraska law).  See also <u>United States v. Beck</u>, 140 F.3d 1129, 1134 (8th Cir. 1998)(holding officer who observed defendant following a motor vehicle too closely had probable cause to initiate a traffic stop).

Trooper Roby observed the defendant following only .68 seconds behind another vehicle.  This time interval is insufficient for a vehicle traveling between 60 and 75 miles per hour to see and perceive a danger, and then react and stop to avoid colliding with the vehicle ahead.  Trooper Roby had probable cause to believe that Anaya-Zepeda had violated Nebraska law by following another vehicle at an unreasonably close distance.  The traffic stop of defendants' vehicle did not violate the Fourth Amendment.

The defendants claim they were unlawfully detained and questioned during the traffic stop.  After stopping a vehicle, the trooper may lawfully ask any questions reasonably related to the stop, which typically includes asking for the driver's license and registration, requesting the driver to sit in the

patrol car, and asking the driver about the origin, destination, and purpose of his trip.  United States. v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994)(citing United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993); United States v. Richards, 967 F.2d 1189, 1192-93 (8th Cir. 1992)).  An officer may detain a motorist while the officer completes certain routine tasks related to the traffic violation, such as writing a citation and completing computerized checks of a driver's license, vehicle registration, and criminal history.  Lyons, 486 F.3d at 371; Fuse, 391 F.3d at 927; United States v. White, 81 F.3d 775 (8th Cir. 1996).  "[A]s part of a reasonable investigation, an 'officer may also question a vehicle's passengers to verify information provided by the driver.'"  United States v. Ward, 484 F.3d 1059, 1061 (8th Cir. 2007)(quoting United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005) and collecting cases.

> The officer cannot continue to detain a motorist after the initial stop is completed unless the officer has a reasonably articulable suspicion for believing that criminal activity is afoot. . . .  If, during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has justification for a greater intrusion unrelated to the traffic offense. . . .

Lyons, 486 F.3d at 371 (internal citations and quotation marks omitted).  Conflicting stories provided by a driver and passenger may justify expanding the scope of a traffic stop and the the detention of the vehicle occupants.  United States v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004).

Anaya-Zepeda and Ayala-Arias provided inconsistent and suspect information to Trooper Roby during the course of this traffic stop.  Anaya-Zepeda claimed he had lived in Las Vegas for eight months, but his driver's license stated he lived in

13

Michigan.  He was driving a vehicle he purchased less than a month before the traffic stop, and the vehicle was insured for only one month.  See exhibit 7.  The defendants claimed they had known each other for many years, and Anaya-Zepeda stated they lived at the same residence in Las Vegas.  However, in response to Trooper Roby's questions, Anaya-Zepeda initially stated he did not know Ayala-Arias' name, and though he quickly corrected that response by identifying Ayala-Arias as "Miguel," he did not know Miguel's last name.  Ayala-Arias did not know Anaya-Zepeda's last name, and stated his first name was "Pepe."  Anaya-Zepeda stated he went by no name other than "Jose."  Anaya-Zepeda stated he was traveling to Michigan to see about getting his old job back but never explained why he could not get that information by telephone; Ayala-Arias said the purpose of Anaya-Zepeda's trip was to visit friends.  When the traffic stop occurred, the defendants had traveled over a thousand miles from Las Vegas without resting.  Such statements, when considered in the totality, indicated criminal activity may be afoot and justified Trooper Roby's additional investigatory questioning and detention of the defendants.  See e.g. United States v. Jimenez, 478 F.3d 929, 932 (8ᵗʰ Cir. 2007)(holding that conflicting stories regarding the travel plans, unusual trip itinerary, occupant's nervousness, and visible modifications to the vehicle supported officer's continued detention and investigation of the motorists); Sanchez, 417 F.3d at 976 (holding the officer reasonably suspected criminal activity where the driver appeared very nervous, she and the passenger had conflicting stories, and the driver did not know the passenger's last name even though she claimed to have known him for almost a year); Jones, 269 F.3d at 928(holding that inconsistent information on travel plans "casts suspicion and doubt on the nature and legitimacy" of defendants' activity).

14

At the conclusion of the traffic stop, Trooper Roby handed
Anaya-Zepeda his warning ticket and the defendants' documents,
told Anaya-Zepeda that the stop was complete, and advised him
that the defendants were free to leave.  Trooper Roby remained
seated in the patrol car, and as Anaya-Zepeda began to exit, he
asked if Anaya-Zepeda would answer some additional questions.
Anaya-Zepeda stopped exiting the patrol car and answered the
officer's questions.  No other officer had contacted Anaya-Zepeda
during the course of this stop.  This conduct by Trooper Roby did
not unlawfully expand the stop in violation of the Fourth
Amendment.

> The fact that [Anaya-Zepeda] was informed that he was
> free to leave and was in the process of leaving the
> patrol car before [Trooper Roby] inquired whether he
> could ask more questions . . . supports a finding that
> the continued encounter was consensual, as does the
> fact that [Trooper Roby] was the only officer present
> at the scene and remained seated in the patrol car
> while making this inquiry.

United States v. Flores, 474 F.3d 1100, 1103-04 (8th Cir. 2007).

Trooper Roby asked both Anaya-Zepeda and Ayala-Arias for
permission to search the vehicle.  Both consented to the search
without hesitation.  Though not entirely clear from their briefs,
the defendants may also be claiming their consents were not
knowing and voluntary, and therefore the search of their vehicle
violated the Fourth Amendment.

Consent to search is voluntary if it was "the product of an
essentially free and unconstrained choice by its maker, rather
than the product of duress or coercion, express or implied."

Flores, 474 F.3d at 1104 (quoting United States v. Bradley, 234
F.3d 363, 366 (8th Cir. 2000)(quoting United States v. Chaidez,
906 F.2d 377, 380 (8th Cir. 1990)).  The government has the
burden of proving by a preponderance of the evidence that the
defendants actually consented to the search of their vehicle or
that a reasonable officer in Trooper Roby's position would
believe they did.  Jones, 254 F.3d at 695; United States v.
Miller, 20 F.3d 926, 930 (8th Cir. 1994).

     In determining whether a consent to search was voluntary,
the court must look at the totality of the circumstances,
including both the characteristics of the accused and the
environment at the time consent was requested.  Flores, 474 F.3d
at 1104.  The court considers the defendants' age, intelligence
and education, whether they were under the influence of drugs or
alcohol, whether they were informed of their right to withhold
consent, and whether they were aware of rights afforded criminal
suspects.  The court also considers the length of time the
defendants were detained; whether they were threatened,
physically intimidated, or punished by the police; whether the
police made promises or misrepresentations to induce or coerce
consent; whether they were in custody or under arrest when the
consent was given; whether the encounter occurred in a public or
a secluded place; and whether the defendants stood by silently as
the search occurred.  Flores, 474 F.3d at 1104; United States v.
Esquivias, 416 F.3d 696, 700 (8th Cir. 2005); United States v.
Chaidez, 906 F.2d 377, 380 (8th Cir. 1990).  These factors serve
as a valuable guide, but are not to be applied mechanically in
determining the voluntary nature of defendants' consent.  Flores,
474 F.3d at 1104; Chaidez, 906 F.2d at 380.

16

Both defendants were adults, and both were able to speak and
understand English.  They appeared alert and not under the
influence of any drugs or alcohol.  Less than fifteen minutes had
passed between the time the stop was initiated and the officer's
request for consent.  The defendants were not under arrest.
Though they were not told they could refuse to consent to a
search, Anaya-Zepeda had been advised that the defendants were
free to leave, and both defendants were told the traffic stop was
complete before Trooper Roby requested consent.  The traffic stop
and the defendants' encounter with Trooper Roby occurred in
daylight on the interstate.  Trooper Roby was the only officer
who had contacted the defendants prior to requesting consent.  He
did not intimidate or punish the defendants, and made no threats
or promises to either defendant.  His tone was conversational and
professional throughout.  During the search, the defendants could
have exited the patrol car and withdrawn their consent, yet they
silently sat watching the search without asking the officers to
stop.  Under the totality of these circumstances, I conclude the
defendants' consent to search was voluntarily given and the
search of the vehicle did not violate the Fourth Amendment.  See
e.g. United States v. Carrate, 122 F.3d 666, 670 (8th Cir.
1997)(holding the defendant voluntarily consented to the search
where, despite his limited ability to speak English and the
trooper's failure to use a written consent form or advise the
defendant of his right to refuse consent, the defendant
understood and appropriately answered the trooper's questions,
had been detained for only a short time before consenting, was
not threatened or physically intimidated, was not promised
anything or misled, was not under arrest when he consented, was
on a public interstate, and stood idly by while the troopers
searched his car, never indicating that he objected to the
search.)

It is not entirely clear whether the defendants are claiming the length of the search itself was unreasonably long in violation of the Fourth Amendment.  Assuming that argument has been raised, it has no merit.

Shortly after the search began, Troopers Roby and Goltz discovered an after-market modification indicative of a false compartment within the vehicle.  This finding supported probable cause to search the vehicle.  United States v. Olivera-Mendez, 484 F.3d 505, 512 (8th Cir. 2007).  When probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.  Olivera-Mendez, 484 F.3d at 512 (8th Cir. 2007)(citing United States v. Ross, 456 U.S. 798, 825 (1982).  "Drug couriers may conceal contraband in a manner that requires dismantling of the automobile to recover the drugs."  Olivera-Mendez, 484 F.3d at 512.  Once the troopers developed probable cause to believe that the defendants' vehicle contained a hidden compartment, "[t]he probable cause to search the vehicle did not 'dissipate' simply because it took a long time to complete a reasonable and thorough search of the car."  Olivera-Mendez, 484 F.3d at 512.

For all the foregoing reasons, I conclude that the traffic stop was lawful, the detention and questioning of the defendants during the traffic stop was not unreasonable or unjustifiably expanded, the defendants validly consented to the officers' search of the vehicle, and the search itself was not unlawful or unreasonable.  The defendants' motions to suppress based on the Fourth Amendment should be denied.

2.   <u>Fifth Amendment Claims.</u>

Anaya-Zepeda claims his statements to law enforcement during interrogation after his arrest must be suppressed under the Fifth Amendment.

The evidence establishes that Anaya-Zepeda was advised of his <u>Miranda</u> rights before he was questioned by Lieutenant Leonard, and he acknowledged that he understood these rights. Prior to signing the waiver of his rights, Anaya-Zepeda was told on more that one occasion that he could refuse to consent to any or all of the officers' questioning.  The defendant indicated he was willing to waive his rights, and he signed the <u>Miranda</u> waiver.

The defendant contends, however, that he did not voluntarily waive his <u>Miranda</u> rights and his statements to the officers were involuntarily given.  "A waiver of the Fifth Amendment privilege against self incrimination is valid only if it is made voluntarily, knowingly, and intelligently."  <u>United States v. Syslo</u>, 303 F.3d 860, 865 (8th Cir. 2002).  A waiver is "knowing and intelligent" if it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right.  A waiver is "voluntary" if it was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception.  <u>Thai v. Mapes</u>, 412 F.3d 970, 977 (8th Cir. 2005).  The ultimate question is whether the defendant's will to remain silent was overborne and his capacity for self-determination critically impaired.  <u>United States v. Santos-Garcia</u>, 313 F.3d 1073, 1079 (8th Cir. 2002).

19

Anaya-Zepeda spoke English and freely conversed in English with Trooper Roby at the scene of the traffic stop, and with Lieutenant Leonard and the other interrogating officers at Troop C headquarters.  Lieutenant Leonard read Anaya-Zepeda his <u>Miranda</u> rights aloud.  As to each <u>Miranda</u> right, Anaya-Zepeda stated he understood the right.  After being told he need not consent to being questioned, Anaya-Zepeda signed the waiver of rights without hesitation.  He did not appear nervous, distraught, or fatigued, and was not under the influence of drugs or alcohol. The interview occurred in late-afternoon.  The officers did not promise Anaya-Zepeda anything, or threaten or coerce him to waive his rights or answer their questions.  The officers' questions were forthright and the tone of the questioning was not unreasonable.  When asked to cooperate in a controlled delivery, he refused.

Based in the evidence, I conclude the defendant was not susceptible to police pressure and his will was not overborne. See e.g. <u>United States v. Jimenez</u>, 478 F.3d 929, 932-33 (8th Cir. 2007)(holding defendant's statement was admissible where the officer read the defendant her rights, she stated she understood each of the rights and wanted to waive her rights and speak to the officer, she was distraught but not under the influence at the time, and she was not threatened or promised anything to secure her consent or statements).  Anaya-Zepeda knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights, and his statements were voluntarily made.  Anaya-Zepeda's motion to suppress his statements should be denied.

20

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, United States District Court Judge, that the defendants' motions to suppress, filings 23 and 25, be denied in all respects.

The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.

IT FURTHER HEREBY IS ORDERED:  Trial is set for 9:00 a.m. on August 13, 2007, for a duration of three trial days before the Honorable Richard G. Kopf in Courtroom 1, United States Courthouse and Federal Building, 100 Centennial Mall North, Lincoln, Nebraska.  Jury selection will be at the commencement of trial.

DATED this 24th day of June, 2007.

BY THE COURT:

s/ *David L. Piester*

David L. Piester
United States Magistrate Judge